[Civ. No. 55083. Second Dist., Div. Five. Feb. 25, 1980.]

MOTORS, INC., Plaintiff and Appellant, v.
TIMES MIRROR COMPANY, Defendant and Respondent.

736

**COUNSEL**

Harold J. Tomin for Plaintiff and Appellant.

Robert C. Lobdell, William A. Niese, Gibson, Dunn & Crutcher, John J. Hanson, H. Frederick Tepker, J. Edd Stepp, Jr., and Joseph A. Collins for Defendant and Respondent.

**OPINION**

**KAUS, P. J.**—Plaintiff Motors, Inc., (Motors) on behalf of itself and as representative of a purported class, appeals from a judgment of dismissal entered against it and in favor of defendant Times Mirror Company (Times Mirror) pursuant to Code of Civil Procedure section 581, subdivision 3.

## FACTS

Motors is a wholesale distributor of automobile products. It purchases its stock from manufacturers and resells it to jobbers who, in turn, sell "to consumers and others."

Times Mirror publishes the Los Angeles Times, alleged to be the "dominant print advertising medium" in the Los Angeles basin. As here relevant, Times Mirror offers display advertising under two different rate "cards" or fee schedules: (1) a "general" or "national" card, applicable to manufacturers and their agents, jobbers, brokers, wholesalers and distributors; and (2) a retail card, which, as its title suggests, sets forth the charges for all retail concerns. The retail card rates are substantially lower at every volume level than are those of the general or national card. Thus, the cost of advertising in the Los Angeles Times is determined in part by the advertiser's role in the production-distribution system.

In 1977, Motors filed its complaint against Times Mirror, alleging that this two-tiered advertising rate structure amounted both to an unfair business practice within the meaning of former Civil Code section 3369 (count 1) and to an unreasonable restraint of trade in violation of Business and Professions Code section 16700 et seq., the Cartwright Act (count 2). It sought damages and injunctive relief.

Specifically, with regard to count 1, Motors alleged: "Defendants' [*sic*] practice is unfair for at least the following reasons:

"(a) The Los Angeles Times is the dominant print media [*sic*] in Los Angeles, and there is no practical substitute available;

"(b) The alleged violation of law is discriminatory and without justification;

"(c) The alleged violation of law unfairly rewards large retail chains and businesses vertically integrated through the retail function; and

"(d) Plaintiff and members of [its] class must spend a substantially greater number of dollars to achieve advertising parity with favored retailers. . . . "

About a year before the complaint was filed, plaintiff started a cooperative advertising program with its jobbers-retailers. A sample ad is attached to the complaint. It informs the reader that about eight automotive products can be purchased at certain prices at about 35 retail stores in Los Angeles and Orange Counties. Plaintiff, who placed the ad, was ·charged under the general rate—30 percent above the retail rate—although its name is not mentioned in the ad.

With regard to count 2, the heart of the charging allegations is that "Each agreement to purchase advertising between defendants and each of them and a favored retail buyer of advertising constitutes an agreement which unreasonably restrains trade..., in that:

"(a) The purchaser under the general rate card is discriminated against in the price paid for advertising *vis-a-vis* competition [*sic*] who purchase under the retail rate card; and

"(b) There is no practical or economic justification for the two rate cards being applicable to sellers of competing products."

On December 23, 1977, Times Mirror filed a general demurrer to the complaint, which was sustained without leave to amend. A dismissal under section 581, subdivision 3 of the Code of Civil Procedure and this appeal ensued.

DISCUSSION

 Plaintiff's argument concerning its first cause of action relies heavily on the expansive interpretation of the term "unfair competition" demanded by *Barquis* v. *Merchants Collection Assn.* (1972) 7 Cal.3d 94, 108-114 [101 Cal.Rptr. 745, 496 P.2d 817]. (See Howard, *Former Civil Code Section 3369: A Study in Judicial Interpretation* (1979) 30 Hastings L.J. 705.) That section—as does its successor, section 17200 of the Business and Professions Code[1]—defines "unfair competition" to include, as relevant, "unlawful, unfair or fraudulent business practice[s]." While *Barquis* itself found the practices there complained of to be unlawful, it did make this significant statement concerning the sweep of the concept of "unfair" practices: "In permitting the restraining of all 'unfair' business practices, section 3369 undeniably establishes only a wide standard to guide courts of equity; as noted above, given the

---

[1]In 1977 relevant portions of section 3369 of the Civil Code were reenacted as section 17200 et seq. of the Business and Professions Code. (Stats. 1977, ch. 299, § 1.)

creative nature of the scheming mind, the Legislature evidently concluded that a less inclusive standard would not be adequate." (*Id.*, at p. 112.) Here the Supreme Court merely echoed that what had been said a decade earlier in *People* ex. rel. *Mosk v. National Research Co. of Cal.* (1962) 201 Cal.App.2d 765, 772 [20 Cal.Rptr. 516]: "[I]t would be impossible to draft in advance detailed plans and specifications of all acts and conduct to be prohibited [citations omitted], since unfair or fraudulent business practices may run the gamut of human ingenuity and chicanery."[2]

■ To these open-ended definitions of unfairness, we would add this obvious thought: that the determination of whether a particular business practice is unfair necessarily involves an examination of its impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer. In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim—a weighing process quite similar to the one enjoined on us by the law of nuisance. (Rest. 2d Torts, § 826; see *Keys* v. *Romley* (1966) 64 Cal.2d 396, 409-410 [50 Cal.Rptr. 273, 412 P.2d 529]; *Sheffet* v. *County of Los Angeles* (1970) 3 Cal.App.3d 720, 729, fn. 5 [84 Cal.Rptr. 11].) While this process is complicated enough after a hearing in which the defendant has revealed the factors determining the utility of his conduct, it is really quite impossible if only the plaintiff has been heard from, as is the case when it is sought to decide the issue of unfairness on demurrer. ■ Therefore—since the complaint is unlikely to reveal defendant's justification[3]—if that pleading states a prima facie case of harm, having its genesis in an apparently unfair business practice, the defendant should be made to present its side of the story. If, as will often be the case, the utility of the conduct clearly justifies the practice, no more than a simple motion for summary judgment would be called for.

---

[2]The court went on to state that the essential test of unfair competition was "whether the public [was] likely to be deceived." That requirement is alluded to in such relatively recent cases as *Payne* v. *United California Bank* (1972) 23 Cal.App.3d 850, 856 [100 Cal.Rptr. 672] and *Plotkin* v. *Tanner's Vacuums* (1975) 53 Cal.App.3d 454, 459 [125 Cal.Rptr. 697]. The rule appears to have originated in trademark cases, such as *Schwartz* v. *Slenderella Systems of Calif.* (1954) 43 Cal.2d 107, 111 [271 P.2d 857], where the problem is confusion of source. The trouble is, however, that it simply does not fit all types of possible unfairness that come within the sweeping language of *Barquis*. Nor, purely as a matter of statutory interpretation, does it make sense to require deception as an ingredient of an allegedly unfair business practice, where the statute speaks disjunctively of "unlawful, unfair or fraudulent business practice[s]."

[3]In this case plaintiff simply pleads that "repeated attempts to elicit a rational explanation from the Los Angeles Times for the unfair practice have not been successful." We assume that the key word in that sentence is "rational."

That the practice complained of by plaintiff—considered by itself, without any judicial guesswork concerning defendant's justification—is unfair, seems obvious. In effect the Times' rate structure forces plaintiff and others similarly situated to pay 30 percent more for an advertisement informing the public where certain products can be purchased at retail, than defendant charges to competing retail establishments that sell the same product.[4] True, plaintiff is not a retailer, but it has an obvious interest in informing the public where and at what prices its products can be obtained. In short, detriment to plaintiff being adequately pleaded, the demurrer should have been overruled to give defendant an opportunity to justify the practice.

Defendant claims that its discriminatory pricing policy is justified by *Harris* v. *Capitol Records etc. Corp.* (1966) 64 Cal.2d 454 [50 Cal.Rptr. 539, 413 P.2d 139], which defendant interprets to permit price discrimination between customers, unless such discrimination is specifically outlawed by a provision of the Unfair Practices Act. (Bus. & Prof. Code, § 17000 et seq.) That act, for example, expressly forbids locality discrimination and secret rebates. (Bus. & Prof. Code, §§ 17040, 17045.) On the other hand it permits functional classifications. (Bus. & Prof. Code, § 17042.)[5] The Unfair Practices Act is, however, a red herring. Count 1 of the complaint is based on a violation of former section 3369 of the Civil Code, now found in chapter 5 of the part of which the Unfair Practices Act is chapter 4.

We hold, therefore, that as to count 1, there is a case to meet. The demurrer should have been overruled.

As far as count 2—the alleged violation of the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.)—is concerned, plaintiff may well be able to state a cause of action, but has not yet done so. All it has pleaded is that each agreement to sell advertising space at the favored retail rates is an agreement with the buyer which unreasonably restrains trade in that it discriminates against advertisers who purchase

---

[4]As plaintiff points out, some of these retail competitors are also manufacturers who do their own internal distributing. Thus, Sears and Montgomery Ward obtain cheaper rates than plaintiff.

[5]We need not decide whether section 17042 was intended to apply only to functional classifications among buyers with distributive functions respecting the seller's product—the situation in *Harris*—or whether it includes the kind of classification practiced by the Times on its customers from the application of the Unfair Practices Act. (See Kelley, *Functional Discounts Under the Robinson-Patman Act* (1952) 40 Cal.L.Rev. 526.)

under the general rate card and "there is no practical or economic justification for the two rate cards being applicable to sellers of competing products." Thus all plaintiff alleges is that agreements by defendant with certain buyers of advertising space, buyers who are not alleged to be parties to any agreement, understanding, or conspiracy to restrain trade, are actionable under the Cartwright Act because they have that incidental effect.

The California Supreme Court demands a high degree of particularity in the pleading of Cartwright Act violations. (*Chicago Title Ins. Co.* v. *Great Western Financial Corp.* (1968) 69 Cal.2d 305, 316-318 [70 Cal.Rptr. 849, 444 P.2d 481].) In particular it has held that "[a] cause of action for restraint of trade under the Cartwright Act...must allege both a purpose to restrain trade and injury to the business of the plaintiff traceable to actions in furtherance of that purpose. [Citations omitted.]" (*Jones* v. *H. F. Ahmanson & Co.* (1969) 1 Cal.3d 93, 119 [81 Cal.Rptr. 592, 460 P.2d 464].) Without belaboring the point, the laconic allegations of count 2 clearly do not meet the *Chicago Title-Ahmanson* standard. On remand, plaintiff shall be given an opportunity to amend count 2.

Reversed.

Ashby, J., concurred.

**STEPHENS, J.**—I concur in the majority opinion. However, for the guidance of the trial court and all parties, section 17042 of the Business and Professions Code, requires a more analytical comment. Any justification for classification under that section relates to a distributive classification within the course of business in which the classifier is engaged, i.e., the thrust of justification is upon the word "functional" as contained in the section. So far as pertinent here, the section reads: "Nothing in this chapter prohibits any of the following:...(b) A *functional* classification by any person of any customer as broker, jobber, wholesaler or retailer." (Italics added.)

Providing Times Mirror seeks support for its differentiation of charges by calling plaintiff a wholesaler rather than a retailer, the support fails. Plaintiff is not Times Mirror's "wholesaler," but is a customer for advertising space, equal and no different from any other customer for like space in its newspaper.

Webster's Third New International Dictionary (unabridged 1966) at page 921, defines "Functional" as follows: "1 a: of, connected with or being a function...; dependently related....b: of, relating to, or based on function or functioning....2: existing or used to contribute to the development or maintenance of a larger whole:..."

As is readily seen, *functional* relates to the business of the manufacturer or producer. Here we are not considering the Times Mirror newspaper's wholesaler-distributor v. the retailer-deliveryman, but rather a totally unrelated business entrepreneur. It is true that plaintiff is a wholesaler, but of auto parts not of advertising, and his competitor *for advertising* is a retailer, of auto parts not of advertising. Thus, so far as the seller of advertising space is concerned, Motors (plaintiff) is in the identical position as *his* competitor, the retail auto parts advertiser. There just is no *functional* distinction permitting a price differential so far as Times Mirror is concerned.[1] (See Kelley, *Functional Discounts Under the Robinson-Patman Act* (1952) 40 Cal.L.Rev. 526.)

A petition for a rehearing was denied March 18, 1980, and on March 25, 1980, the opinion was modified to read as printed above. Respondent's petition for a hearing by the Supreme Court was denied April 24, 1980.

---

[1]Price differential between the wholesaler and retailer by the manufacturer of auto parts for purchase of like parts is entirely different for the rung of distribution than has its *functional* aspect.